693 F.Supp. 821 (1988)
The STATE OF CALIFORNIA, acting By and Through the CALIFORNIA COASTAL COMMISSION, Plaintiff,
v.
J. Curtis MACK, Acting Administrator, National Oceanic and Atmospheric Administration; Peter Tweedt, Director, Office of Oceanic and Coastal Resource Management; and the Office of Ocean and Coastal Resource Management, Defendants.
No. C-88-0015 EFL.
United States District Court, N.D. California.
April 14, 1988.
*822 John A. Saurenman, Deputy Atty. Gen., Los Angeles, Cal., James K. Jackson, American Petroleum Institute, Washington, D.C., for plaintiff.
Charles O'Connor, Asst. U.S. Atty., San Francisco, Cal., Gary Randall, U.S. Dept. of Justice, Lands & Natural Resource Div., Gen. Litigation Section, Washington, D.C. for defendants.

ORDER GRANTING PRELIMINARY INJUNCTION
LYNCH, District Judge.
This action is before the Court on plaintiff California Coastal Commission's application for a preliminary injunction. The case presents questions regarding the scope of authority of defendant National Oceanic and Atmospheric Administration ("NOAA") under the federal Coastal Zone Management Act. Specifically, the issue is whether NOAA exceeded its authority when it conditioned a grant to the California Coastal Commission (the "Commission") on a requirement that the Commission draft and submit for NOAA's approval guidelines pertaining to exploration and development of the Outer Continental Shelf area off the California coast. For the reasons explained below, the Court grants the Commission's application.

BACKGROUND
In 1972, Congress enacted the Coastal Zone Management Act (the "CZMA" or the "Act"), 16 U.S.C. §§ 1451-1464, in order to encourage and assist states "in preparing and implementing management programs to preserve, protect, develop and whenever possible restore the resources of the coastal zone of the United States." S.Rep. No. 753, 92d Cong., 2d Sess. 1, reprinted in 1972 U.S.Code Cong. & Admin.News 4776. To this end, the CZMA offers two primary incentives to states that establish qualified coastal zone management plans. First, the federal government provides financial assistance to the programs in the form of grants. See, e.g., 16 U.S.C. §§ 1454, 1455. Second, the CZMA enhances the states' *823 ability to control the use and development of their coastlines by authorizing them to determine whether a proposed activity affecting the coastline will qualify for a federal license. See id. § 1456(c). This procedure is referred to as a "consistency determination": an applicant for a federal license to conduct an activity affecting the coast of a state with an approved coastal management plan must first obtain a certification from the state that the proposed activity is consistent with the coastal plan. Id.
To qualify for the benefits provided under the CZMA, a state must obtain federal approval for its coastal management program. See id. §§ 1454(b), 1454(h), 1456(c). Pursuant to authority delegated from the Secretary of Commerce, NOAA is the federal agency responsible for making approval determinations. In addition, NOAA is responsible for a "continuing review of the performance of coastal states," id. § 1458(a), and is authorized to withdraw program approval under certain circumstances, id. § 1458(d).
In 1976, the Commission submitted the California Coastal Management Plan (the "CCMP") to NOAA for approval. The CCMP consisted of five elements: the Coastal Act of 1976, the Coastal Conservancy Act, the Urban and Coastal Park Bond Act, the Commission's final regulations, and the "Program Description" contained in Part II of the Final Environmental Impact Statement. NOAA approved the CCMP in 1978, but not until after the issue of approvability had been litigated in federal court.
In American Petroleum Institute v. Knecht, 456 F.Supp. 889 (C.D.Cal.1978), aff'd, 609 F.2d 1306 (9th Cir.1979), the central dispute was whether the CCMP lacked "the requisite specificity Congress intended management programs to embody ... so as to enable private users in the coastal zone subject to an approved program to be able to predict with reasonable certainty whether or not their proposed activities will be found `consistent' with the [management plan.]" 456 F.Supp. at 918. The Knecht court agreed with NOAA's position that Congress did not intend a requirement that states "establish such detailed criteria that private users be able to rely on them as predictive devices for determining the fate of projects without interaction between the relevant state agencies and the user." Id. 456 F.Supp. at 919. Accordingly, the court refused to enjoin the approval of the CCMP. Since Knecht, the CCMP has remained largely unchanged, the only difference being the addition, with NOAA's approval, of some "Local Coastal Programs."
As part of its continuing review process, NOAA must periodically analyze "the extent to which the state has implemented and enforced the program approved by the Secretary." 16 U.S.C. § 1458(a). Additionally, if NOAA determines that a coastal state is "failing to make significant improvement in achieving ... coastal management objectives," it must reduce funding to the state. Id. § 1458(c). In accordance with these obligations, NOAA has, on several occasions since 1978, prepared written evaluations of the CCMP and, based on those reports, negotiated with the Commission over targeted areas for "significant improvements." One result of these negotiations has been the drafting of "significant improvement tasks." Accomplishment of these tasks is sometimes a condition to receipt of some portion of the federal grants controlled by NOAA.
The federal financial assistance provided to the Commission is essentially of two types. The bulk of the funding is allocated to basic implementation or administrative operations of the Commission. The remaining portion goes to finance the significant improvement tasks that the Commission is to undertake.
The most recent NOAA review of the CCMP took place in 1987. As in the past, NOAA and the Commission reached agreement on most of the significant improvement tasks the Commission would undertake. They could not agree, however, on one of the tasks proposed by NOAA. NOAA insisted that the Commission prepare and submit for approval guidelines *824 that would provide greater predictability for parties seeking consistency determinations for proposed activities affecting the Outer Continental Shelf. The Commission refused, contending that it would lose necessary flexibility and that the current case-by-case, negotiated process was preferable. In response, NOAA withheld most of the Commission's administrative funding. After the Commission capitulated "under protest," and Congress enacted legislation ordering NOAA to release the Commission's administrative funding, see Pub.L. No. 100-202, 101 Stat. 1329-5 (1987), NOAA issued the grants.
As drafted by NOAA, the financial assistance award is subject to certain conditions. NOAA and the Commission agree that one of those conditions is the accomplishment of "significant improvement task 1.4." Task 1.4 provides in part that:
The [Commission] will develop guidelines concerning the application of the Coastal Act Chapter 3 policies, including Section 30260, to consistency certifications for OCS Plans of Exploration and Development and Production ... and will adopt such guidelines in accordance with California law. Once the Commission adopts guidelines, it will submit them to OCRM for review and approval as a program change.
NOAA and the Commission apparently do not agree on which funds are conditioned on the accomplishment of Task 1.4. Although NOAA initially withheld most of the adminsitrative grant from the Commission, NOAA now urges that only the money allocated to significant improvement tasks is subject to "deobligation." The Commission maintains that the much larger sum represented by the administrative portion of the assistance is tied to Task 1.4. The language of the relevant "special award condition" appears to support NOAA on this point. Special award condition 6 provides in part that:
NOAA/OCRM reserves the right to deobligate Federal funds from this award in an amount equal to those Federal funds devoted to "significant improvement" tasks in this award or any previous award if NOAA/OCRM finds that the recipient has failed to make satisfactory progress toward significant improvement in accordance with the tasks and benchmarks outlined in the memorandum referenced above, [including task 1.4].
The Commission relies for its interpretation on "prefatory language" to special award condition 1. The pertinent language provides that "[t]he following conditions apply to all CCC funding from NOAA...." (Emphasis added). However, the "following conditions" do not include Task 1.4, so the language threatening the loss of "all" funding does not appear relevant to accomplishment of that significant improvement task.
The present posture of the case is that the Commission is in receipt of the federal funds, subject to a number of conditions, one of which is the preparation of guidelines for consistency determinations pertaining to Outer Continental Shelf development. The Commission contends that it was beyond NOAA's authority to impose this condition and asks this Court to enjoin NOAA from enforcing it.

DISCUSSION
The essence of this dispute boils down to two questions: (1) whether NOAA possesses authority under the CZMA to coerce a modification of a state's previously approved coastal management program through conditions attached to federal funding; and (2) whether NOAA has attempted to exercise such authority by conditioning significant improvement funding on the accomplishment of Task 1.4. The first question appears to be one of first impression, and the answer must therefore be gleaned largely from an examination of the CZMA and NOAA's regulations. The second question turns on a reading of the financial assistance award itself and a determination of the impact of Task 1.4 on the CCMP.

A. NOAA's Authority to Condition a Grant On a Program Change

The CZMA contains several sections outlining NOAA's powers and responsibilities, *825 as the delegate of the Secretary of Commerce, under the Act. See, e.g., 16 U.S.C. §§ 1454, 1455. None of these provisions, however, speak directly to the scope of NOAA's authority to require, on pain of loss of funding, a modification in a coastal management program. Nevertheless, the statutory scheme does provide guidance on this issue.
The main provisions governing NOAA's authority to ensure that states with approved programs further the objectives of the CZMA are contained in 16 U.S.C. § 1458. Subsection 1458(a) directs NOAA to "conduct a continuing review of the performance of coastal states" in order to determine "the extent to which [each] state has implemented and enforced the program approved by [NOAA] ... and adhered to the terms of any grant ... funded under this chapter." Subsection 1458(c) authorizes NOAA to reduce and even withdraw funds if it determines that "the coastal state is failing to make significant improvement in achieving the coastal management objectives," or if the state "is failing to make satisfactory progress in providing in its management program" for the designation and inventory of coastal areas containing resources of national significance. Subsection 1458(d) provides that NOAA "shall withdraw approval of the management program of any coastal state ... if [NOAA] determines that the coastal state is failing to adhere to [and] is not justified in deviating from (1) the management program approved by the Secretary, or (2) the terms of any grant ... funded under section 1455 of this title, and refuses to remedy the deviation."
The structure and logic of these provisions imply that NOAA does not possess the authority to condition all "significant improvement" grants on a program change. For example, while subsection (c) plainly contemplates that NOAA may place conditions on grants, subsection (a) strongly suggests that NOAA's function, once the state obtains program approval, is limited to ensuring that the state has "implemented and enforced the program approved by [NOAA]." Id. § 1455(a) (emphasis added). Similarly, subsection 1458(d) obligates NOAA to withdraw approval if the state unjustifiably deviates from the approved program, again intimating an expectation by Congress that NOAA, rather than seeking changes in an approved program, would promote adherence to such a program. Notably, the Act nowhere authorizes NOAA to withdraw program approval on the basis of NOAA's determination that the plan as originally approved no longer complies with the CZMA's requirements.
These provisions indicate that NOAA does not have authority to revisit the approvability of a plan. In other words, once NOAA determines that a program satisfies the requirements of the CZMA and grants final approval, it may no longer examine the content of the approved program, only the adequacy of its execution. Only if NOAA determines that the state is not, in fact, satisfactorily implementing its plan, and the state refuses to remedy this deficiency, may NOAA withdraw approval, and even then it must follow the notice and hearing procedures specified in section 1458(e). In short, a careful reading of the enforcement provisions of the CZMA leaves the clear impression that NOAA may not use its power over funding to accomplish indirectly what it may not accomplish directly: enforce alteration of the approved program itself.
This does not mean that an approved plan is set in stone. The statute provides for alteration of coastal management plans, but contemplates that the states shall be the entities to decide in the first instance whether a change is desirable or necessary. Section 1455(g) states that "[a]ny coastal state may amend or modify the management program which it has submitted and which has been approved by [NOAA]...." (Emphasis added.) Thus, while NOAA must determine whether the modification complies with the statutory scheme, Congress evidently intended that NOAA would play a passive role in this process, merely reviewing proposals put forth by the state.
It is not difficult to understand why Congress would not wish to allow NOAA to pursue changes the content of a program after initial approval. If the rule were *826 otherwise, the states could have little confidence in the continuing validity of the initial approval. As the relevant federal personnel and policies changed, the states would be subject to repeated review and pressure to change an already approved coastal program. Having expended significant resources on the development of a plan, they could be faced with the choice of revamping the plan or losing the federal assistance. It seems unlikely that Congress intended such a result.
A recent amendment to subsection 1458(c) reinforces this view. Prior to 1986, the subsection authorized the reduction and withdrawal of funding only when the state failed to make significant improvement in achieving the basic policy goals set out in section 1452. The 1986 amendment added a second circumstance, apparently not applicable here, in which NOAA could cut off funds: where the state does not make sufficient progress toward "providing in its management program for ... matters" pertaining to the preservation of certain coastal resources. (Emphasis added.) Here, for the first time, Congress empowered NOAA to sanction a state for the failure to amend its coastal program, as opposed to poor implementation of the program. This implies a congressional belief that NOAA does not otherwise possess such authority.
Even NOAA's regulations implementing the CZMA reflect the sense that the states shall have primary control over their programs. Indeed, those regulations provide that "[t]he State will take the initiative in proposing significant improvement activities," suggesting that even in implementation matters, NOAA is not to present its own agenda of proposed projects. See 15 C.F.R. § 923.103. Moreover, the regulations clearly contemplate that NOAA and the state will "negotiate" an "agreement" on grant terms, see, e.g., 15 C.F.R. § 928.5, not hold all funding hostage until the state relents and modifies its program.
Obviously, NOAA should have the flexibility to suggest steps that a state may take to better achieve the objectives of the CZMA. For example, if a state were to propose, at NOAA's suggestion, a change in its program and request an allocation of federal funding to assist in that change, NOAA should have the authority to condition the money allocated to that project on its accomplishment. However, that is not the case here, because the Commission did not propose Task 1.4, but actually resisted it. In addition, NOAA did not limit the condition to funds allocated to Task 1.4, but tied all significant improvement money to the task.
Thus, the question here is one of degree. Clearly Congress realized that NOAA, through its control of federal financial assistance, would wield considerable influence over state coastal programs. But it is also clear that Congress did not intend to confer on NOAA the ability to manipulate the coastal policy of the states. "There is no attempt to diminish state authority through federal preemption. The intent of this legislation is to enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their coastal zones." S.Rep. No. 753, 92d Cong., 2d Sess. 1, reprinted in 1972 U.S.Code Cong. & Admin.News 4776. Moreover, the special legislation commanding NOAA to release funds to the Commission demonstrates that NOAA has acted contrary to the will of Congress in its handling of the present matter. See Pub.L. No. 100-202, 101 Stat. 1329-5 (1987). Accordingly, this Court concludes that, whatever authority NOAA may have to impose implementation requirements as conditions to grants, it may not revisit the question of the management program's adequacy by forcing a state to choose between modifying the program and losing federal financial assistance under the CZMA.

B. Task 1.4 as a Modification of the CCMP

Having concluded that NOAA is without authority to condition a grant on the alteration of a previously approved coastal management program, the Court must now decide whether NOAA's insistence on the preparation of guidelines in *827 this case constitutes a demand for a change in the CCMP, or merely a requirement for a particular form of program implementation. The question is close.
As noted above, the CCMP has a very defined identity: it consists of a specified list of statutes, ordinances and other rules governing the regulation of coastal use and development. Consequently, any addition, deletion or alteration of this closed universe of laws would constitute a modification requiring NOAA's approval under section 1455(g).
The language of Task 1.4 itself indicates that NOAA seeks a modification of the CCMP through the addition of guidelines to the program. That language, drafted by NOAA, instructs the Commission to prepare the guidelines and then "submit them to OCRM for review and approval as a program change." (Emphasis added.) At a minimum, this is strong evidence that NOAA viewed this condition as a substantive modification of California's coastal program, requiring formal approval pursuant to section 1455(g).
NOAA seeks to counter this interpretation of its language by referring to its regulations. Under those regulations, as NOAA reads them, a "change" may be either an "amendment" or a "routine program implementation." See 15 C.F.R. § 923.80-84. An "amendment" is a "substantial change[] in, or substantial change[] to[,] enforceable policies related to" certain aspects of a coastal management plan, and requires approval under section 1455(c). 15 C.F.R. § 923.80(c). A "routine program implementation" is a "[f]urther detailing of a State's program that is the result of implementing" the approved program, and is not subject to the approval process of an amendment. Id. § 923.84(a). According to NOAA's argument, these provisions mean that the "change" required under Task 1.4 could be either an amendment or a routine program implementation, depending on the content of guidelines ultimately adopted by the Commission.
Although this argument has some merit, it cannot negate the language chosen by NOAA. The task requires submission of the guidelines for "review and approval." (Emphasis added.) While a state adopting a routine program implementation must, under the regulations, notify NOAA of this action in order to allow a determination as to whether it is actually an amendment, 15 C.F.R. § 923.84(b), the state need not obtain approval, id. § 923.84(a). Moreover, the regulations speak of "changes" only in defining amendments. Nowhere do they provide that a "change" may be a routine program implementation, as NOAA suggests. If NOAA truly sought an implementation of the existing program, it chose an odd way of expressing it.
NOAA advances a second argument in support of its contention that it seeks only an implementation. It points out that the California Coastal Act requires the Commission to adopt "[i]nterpretive guidelines designed to assist ... persons subject to the provisions of this chapter in determining how the policies of this division shall be applied in the coastal zone prior to certification of local coastal programs...." See Cal.Pub.Res.Code § 30620. Thus, argues NOAA, Task 1.4 merely encourages implementation of one provision already contained in the CCMP.
Again, the argument has merit, but fails nonetheless. Two reasons support this conclusion. First, the applicability of the cited section is unclear. It requires adoption of guidelines to govern the application of policies "prior to certification of local coastal programs." Here, the parties agree that at least some local coastal programs have been incorporated into the CCMP, so it would seem that in those areas the guidelines requirement no longer holds any force. Second, the language of Task 1.4 again undermines NOAA's argument. The task does not refer to section 30620, and dictates the adoption of guidelines only with respect to Outer Continental Shelf exploration, development and production. Further, section 30620 clearly does not contemplate *828 the incorporation of the guidelines into the CCMP, but Task 1.4 does.
In summary, NOAA appears to have reversed itself on the position it took in Knecht. There, it contended that guidelines supplying greater predictability to applicants for consistency certifications need not be part of California's coastal program. Now, it seems to believe the opposite. In view of this history, and the language of NOAA's financial assistance award, this Court is persuaded that NOAA's Task 1.4 demands a modification in the CCMP.

CONCLUSION
To obtain a preliminary injunction, the moving party must demonstrate either probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships is tipped sharply in the movant's favor. See, e.g., Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir.1987). Here, as discussed above, the Commission has, at a minimum, raised serious questions about NOAA's authority to condition funding on program changes. Indeed, although this is a preliminary injunction, there would seem to be little factual information remaining to be developed.
With respect to irreparable injury and balance of hardships, the Commission has met both standards. The potential loss of control over the regulation of its coastline entails a serious risk of irreparable injury, and the resource expenditure in complying with the improper condition tips the balance of hardships in the Commission's favor. Accordingly, this Court grants the Commission's application, and enjoins the defendants from taking any steps, during the pendency of this action, to enforce significant improvement task 1.4 or its benchmarks as specified in the final financial award document executed by the Commission under protest on January 4, 1988. This prohibition includes but is not limited to actions by defendants to withdraw federal approval of the CCMP or to reduce or withdraw federal financial assistance as a result of noncompliance with Task 1.4 or its benchmarks.
IT IS SO ORDERED.